

# HUTTON
**Engineering Services**

1317 State Route 169
Little Falls, NY 13365

December 31, 2009

Mr. Clem C. Trischler
Pietragallo, Gordon, Alfano, Bosick & Raspanti, LLP
The 38 Th. Floor
One Oxford Center
Pittsburgh, Pennsylvania 15219

Re: Kelly Cousins v. Smith & Wesson Corp.

Dear Mr. Trischler,

    Pursuant to your request, I have conducted my examination of the subject firearm and I have reviewed various discovery materials provided to me to-date in this case, which included the following:

- Plaintiff's Petition
- Medical treatment records of Kelly Cousins
- Plaintiff's Answers to First Set of Interrogatories
- Plaintiff's Responses to (First) Request for Production of Documents
- The Safety & Instruction Manual for the Walther PPK - PPK/S Pistol
- DVD video of testing of subject pistol produced by plaintiff
- Recall notice issued by Smith & Wesson for the Walther PPK and PPK/S pistols

    Below is my report on my examination of the subject pistol. Following that are my opinions regarding the issues in this case as can be offered at this time.

## SUBJECT GUN EXAMINATION

    My examination of the subject pistol was conducted on November 24, 2009, at the Smith & Wesson plant in Springfield, Massachusetts. Present for the examination were:

    Mr. Clem Trischler, attorney for Smith & Wesson Corp.
    Mr. James Marrion, attorney for Smith & Wesson Corp.
    Mr. James Hutton, independent expert for Smith & Wesson Corp.



EXHIBIT P-3

The evidence presented for examination was contained within the original black Smith & Wesson pistol case. There was the subject pistol, one S&W Model PPK/S-1, serial number 7739 BAE, with the two black pistol grips removed, the two pistol grips, two magazines - one plain and one with the grip extension, and with a small manila envelope for the factory-fired spent casings. Attached are photographs taken during my examination of this evidence.

## Subject Pistol Examination

The subject firearm is a double-action semi-automatic pistol, in polished stainless steel with black hard polymer grips. It was manufactured by Smith & Wesson in Houlton, Maine under license from Walther. On the left side of the slide there is the copyright scroll logo of "WALTHER" marking, and under this is "SMITH & WESSON, HOULTON, ME USA". There is the caliber designation of ".380ACP" etched onto the right side of the chamber of the barrel and on the right side of the frame the pistol there is the serial number and model designation of "7739 BAE PPK/S-1".

## FIREARM - Condition & General Function

Examination of the exterior of the firearm indicates that the overall condition of the revolver is classified as "NRA Excellent ". The silver colored matte finish and polished stainless steel exterior of the pistol was very clean with no lubrication, and no significant mars. The movement of the slide was smooth, and the function and feel of the trigger, the hammer and the safety was normal.

The function of the large slide-mounted safety was very positive: with the safety lever in the "safe" position (lever down, no red dot showing), a trigger pull would not fire the pistol, and with the safety in the "fire" position (lever up, in a horizontal orientation), a trigger pull would fire the pistol. The safety lever moves through a rotational arc of approximately 80 degrees, and the force required to move the safety from the "fire" position to the "safe" position, and from the "safe" position to the "fire" position was judged to be normal for this design - in excess of four pounds. The safety detents in both the "fire" and "safe" positions were felt to be quite positive and easily discerned by this examiner, as well as being visually obvious. In summary, the operation of the manual safety on the incident pistol was perfect: if the manual safety is in the "safe" position, the internal cylinder of the manual safety positively prevents the hammer from reaching the firing pin under any circumstances of handling.

The trigger pull required to fire the pistol in the single-action mode was measured to be 4.43 pounds peak force acting through a distance of approximately one-eighth of an inch, and the trigger pull required to fire the pistol in the double-action mode was measured to be 12.02 pounds peak force acting through a distance of approximately one-half of an inch; both averages of five measurements made with a Chatillon digital electronic force gauge. The release of the hammer by the trigger at the end of the trigger movement, in both the single-action and double-action mode, felt quite clean and crisp.

## FIREARM - Specialized Function Tests - Safety on "Safe"

Because the manufacturer and type of .380 ACP ammunition that was in use by Mr. Cousins at the time of the incident was unknown, and the incident fired case was not provided for examination, Federal brand .380ACP cases were used for tests.

To test to determine if there was any marking or indention of the primer in a cartridge which was being chambered, each of four test cases were inserted into the chamber of the barrel with the slide fully rearward and then the slide was released. Two primed test cases made from Federal .380 ACP "Hyda-Shok" ammunition and two un-primed test cases were made from Federal .380 ACP standard FMJ ammunition, with the primer pockets completely filled with gray clay – both types were used to indicate any degree of primer indent. None of the four test cases showed any degree of primer marking or indent whatsoever, indicating that the subject pistol will not fire a cartridge on slide impact during the chambering of a live round.

In a test to determine if there was any marking or indention of the primer in an already chambered cartridge due to the use of the decocking lever, each of the four test cases from above were inserted into the chamber of the barrel with the slide fully rearward and the safety on "safe", and the slide then released. The safety was then placed into the "fire" position, the hammer cocked, and then the hammer was "de-cocked" - allowed to fall using the decocking function of the safety lever - as the safety was manually moved from the "fire" position to the "safe" position. Because none of the four test cases showed any indent whatsoever, this indicated that the subject pistol cannot fire a cartridge on use of the decocking lever.

In a test to determine if there was any marking or indention of the primer in an already chambered cartridge due to the pulling of the trigger with the safety in the "safe" position, each of the four test cases from above were inserted into the chamber of the barrel with the slide fully rearward and the safety on "safe", and the slide then released. The trigger was then pulled forcefully and repeatedly, and the pistol would not fire.

In a test to determine if there was any marking or indention of the primer in an already chambered cartridge due to the pulling of the trigger with the safety in the "fire" position, two tests were conducted using cases made from Federal .380 ACP "Hyda-Shok" ammunition. These cases with live primers were inserted into the chamber of the barrel with the slide fully rearward and the safety on "safe", and the slide then released. The safety was then moved to the "fire" position and the trigger was then pulled - in an intentional effort to fire the pistol. In each instance, the pistol fired as intended. The depth of the firing pin indents in these two deliberately fired primed cases were both measured to be 0.0185", eighteen and one-half, one-thousandths of an inch.

The results of the above sequence of tests clearly indicate that the subject pistol will not fire as the result of any manipulation of the slide, the safety or the trigger, if the manual safety is in the "safe" position. And, the subject pistol will fire if the trigger is pulled with the manual safety in the "fire" position. These tests show that the safety of the subject pistol must have been in the "fire" position at the time of this incident.

## The Incident

The only information that this examiner has to-date with regard to the incident itself is the following: The plaintiff's petition stated that the incident pistol was alleged to have fired: (page 1, 5) "...as the petitioner was adjusting his Walther PPK/S pistol in its holster, the pistol discharged suddenly without the trigger having been pulled." And, on page one of the Thibodaux Regional Medical Center Patient Notes: "...with self inflicted GSW to R thigh; was trying to put 380 pistol in holster and accidentally went off...".

## The Plaintiff's Test Firing Video

The only other source of further information provided to this examiner regarding the status of the subject pistol at the time of the incident is the DVD video record of the test firing of the subject pistol at an outdoor shooting range. This video shows two live rounds of Speer "Gold Dot" brand ammunition being loaded into the magazine of the subject pistol, and the magazine then loaded into the pistol. Then, the pistol frame - without grips - was clamped into a machine vise, and aimed down range. The hammer was decocked from the fully cocked position to the forward-most, down, position by manually moving the safety from the "fire" position to the "safe" position. Then the safety was moved to the "fire" position, and the hammer was then pulled rearward to the nearly fully cocked position using a string tied to the hammer spur. On this first test shot, when the string was released, and the hammer was allowed to fall from nearly the fully cocked position, with the safety in the "fire" position, the pistol fired. On the second test shot, the hammer was pulled rearward - two times - to the nearly fully cocked position using the string tied to the hammer, and then released, and the subject pistol did _not_ fire. On the third attempt to fire this second test shot, with the safety still in the "fire" position, the subject pistol did fire when the hammer was allowed to fall from the nearly fully cocked position. Both of the test firings of the subject pistol in this test video occurred when the hammer fell from the near fully cocked position with the manual safety not in the "safe" position, but in the "fire" position.

## FIREARM - Specialized Function Tests - Safety on "Fire"

Because the manual safety positively blocks the hammer from reaching the firing pin when it is in the "safe" position, all of the following tests were conducted with manual safety in the "fire" position, as it must have been at the time of the incident.

To test the function of the pistol under the abnormal condition of the manual safety being in the "fire" position and an outside force of sufficient strength acting directly rearward onto the hammer spur to first, partially cock the hammer, and then second, release the hammer, to allow the hammer to impact the firing pin, the following tests were conducted: Using three primed cases for each test - first, one Federal "Hydra-Shok" and then two Federal standard FMJ cases, were chambered with the manual safety in the "fire" position, and left in that position for the test.

In the first test series, the hammer was manually rotated rearward to a position of approximately 50 percent cocked, and then released. None of the three primed cases fired, and they had firing pin indents of 0.0020", 0.0035" and 0.0035" respectively.

In the second test series, the hammer was manually rotated rearward to a position of approximately 75 percent cocked, and then released. None of the three primed cases fired, and they had firing pin indents of 0.0035", 0.0065" and 0.0055" respectively.

In the third and last test series, the hammer was manually rotated rearward to a position of approximately 95 percent cocked - almost fully cocked by the sear - and then released. All of the three primed cases fired, and they had firing pin indents of 0.0110", 0.0130" and 0.0125" respectively. (It should be noted that in the above primed case testing, the nickel plating on the brass primer of the "Hyda-Shok" cases adds slightly to the strength of the primer in resisting the firing pin blow, which therefore results in a slightly shallower firing pin indent than from the plain brass primers.)

The force necessary to act tangentially to the hammer, to rotate the hammer rearward to the 50%, 75% and then the 95% of fully cocked positions was measured tangent to the knurled hammer spur, and a peak force of 4 to 4 ½ pounds was observed to occur just prior to the 95% - or fully cocked - hammer position.

Given the fact that the hammer of the subject pistol lies very well shielded - in all directions - by the width and height of the slide and frame spur, it is very difficult for this examiner to see how 1) any force in excess of four pounds came to be present in the zone of the hammer, 2) the force was tangentially applied to the hammer spur to rotate the hammer in an upward and rearward arc, 3) the force rotated the hammer fifty-five degrees relative to the frame, to a position just short of the fully cocked position - but not beyond, and then 4) the force was spontaneously absent, which 5) allowed the hammer to fall, now unrestricted by any forces: "...as the petitioner was adjusting his Walther PPK/S pistol in its holster..." or when "...trying to put 380 pistol in holster...".

## No Evidence Examination - Holster, Ammunition or Incident Case

Although the holster, the ammunition in use at the time, and the incident case are all quite relevant and necessary for a complete investigation of this incident to be conducted, they have not been made available to this examiner as of this time.

## The Walther PPK/S Design in Perspective

The Walther PP was the first successful double-action semi-automatic pistol in the world, introduced in 1929 by the Walther firm of Ulm, Germany. This was the start of the Walther series of PP pistol designs, which have since come to include the PPK, PPK/S, PPK-L, and PPK/E. Various models of the PP series has been manufactured by Walther in Germany, prior to and during World War II, in France following the war, in the United States for InterArms, and since 2002 to the present, the Walther PPK/S has been made by Smith & Wesson under license to Walther.

The basic PP and PPK models have been widely popular in Europe for the past eighty years, being used by the military, police and civilians alike, chambered for the .22 LR, .32 ACP and .380 ACP cartridges, and have been acclaimed for their quality of manufacture and reliability of design. In this country, despite eighty years of handgun design evolution, and the wide variety of double-action and DAO polymer frame pistol designs which are currently available, the charisma of the legendary PPK persists - in much the same way and for the same reasons - as it does for the venerable Colt 1911.

## OPINIONS

Based on my examination of the subject firearm, a Smith & Wesson Model PPK/S semi-automatic pistol, serial number 7739 BAE the various discovery materials provided, and based on my knowledge, experience and training in mechanical engineering and particularly with regard to the design and proper technique for the carrying and function of semi-automatic pistols, I offer the following opinions to a reasonable degree of engineering and scientific certainty, in this matter:

1) There is no defect in the design or manufacture of the subject firearm, one Smith & Wesson Model PPK/S model pistol, serial number 7739 BAE. The Walther PPK/S as manufactured by Smith & Wesson is an excellent version of the historically important, popular and safe double-action pistol design.

2) Based on my examination of the evidence provided, I fail to see how the subject pistol could have fired - even with the safety in the "fire" position - without some manner of manipulation of the hammer and/or the trigger by the user, Mr. Cousins.

3) The manual safety on the incident S&W Model PPK/S pistol works very positively as designed, and if the manual safety had been used by Mr. Cousins, this accident would not have occurred.

4) The Smith & Wesson Safety and Instruction Manual for the Walther PPK/S clearly instructs the shooter with regard to safe handgun handling and also instructs the user in the safe and proper way to inspect, load, fire, decock and unload the Model PPK/S pistol, including the proper use of the manual safety feature provided.

5) While the circumstances of this accident have not been fully investigated as of this time, it appears that Mr. Cousins could have prevented this accidental discharge by using common sense and following safe gun handling practices.

The opinions expressed above are based on the information and materials made available to date, and these opinions may be supplemented in the future as additional information is received or examination and/or testing of new or existing evidence is conducted. In particular, my examination of the incident holster, the unfired incident ammunition, and the fired casing from the incident cartridge, and my examination of the fired cases from the plaintiff's video tests, is necessary for me to offer further opinions.

Attached is a copy of my current resume which sets out my qualifications. Also attached is a listing of my testimony in other cases for the last four years. The rate of compensation for my time is $250 per hour.

**James C. Hutton**
James C. Hutton, P.E.

Attachments

### Evidence Examination - 11/24/09



**Photograph 1**



Photograph 2



Photograph 3



**Photograph 4**



**Photograph 5**

- end -

## Resume

### PERSONAL DATA

| | |
|---|---|
| Name: | James Cameron Hutton |
| Home Address: | 1319 State Route 169<br>Little Falls, NY  13365 |
| Business Address: | Hutton Engineering Services  Tel: (315) 823-0100<br>1317 State Route 169  Fax: (315) 823-1827<br>Little Falls, NY  13365  Cell: (315) 527-8018 |
| Date of Birth: | June 15, 1945 |
| Place of Birth: | Denver, Colorado |
| Marital Status: | Married |
| Name of Spouse: | Mary Ellouise (Pritchett) |
| Names of Children:<br>Dates of Birth: | Elizabeth A. Hutton   James P. Hutton   Emily D. Hutton<br>October 21, 1977   February 11, 1986   February 9, 1988 |
| Present Health: | Excellent |

### EDUCATION

Bachelor of Science Degree in Mechanical Engineering, Texas A & M University, January 1969.

### MILITARY SERVICE

Undergraduate military training in the Texas A & M Corps of Cadets, U.S.A.F., no active duty.

### LICENSE

Registered Professional Engineer, State of New York, License 50280, February 1974, to present.
Registered Professional Engineer, State of Alabama, License 28176-E, December 2006, to present.

### PATENTS

#3,893,370  issued 07/08/75
#3,949,507  issued 04/13/76
#4,044,487  issued 08/30/77          All patents relate to firearms design.

### MEMBERSHIP IN PROFESSIONAL SOCIETIES

National Society of Professional Engineers
New York State Society of Professional Engineers - Past President, Oneida/Herkimer County Chapter
Association of Firearm and Tool Mark Examiners - Technical Advisor

Resume - James C. Hutton
Page - 2 -

## EXPERIENCE

### Hutton Engineering Services                                  November, 1994 to Present

Owner of Hutton Engineering Services - Serve as engineering consultant on firearms of all types, including rifles, shotguns, pistols, revolvers and other cartridge powered devices, and all small arms ammunition and blackpowder products, regarding a broad scope of design and safety issues. HES has comprehensive capabilities for the analysis and testing of firearms and ammunition products for design acceptance and for pending litigation.

### Independent Consultant                                       1985 to November, 1994

While employed full time as an employee of Remington Arms Company, Inc., served as an independent engineering consultant on an after-hours basis for all types of firearms not manufactured by Remington, including pistols, revolvers and "bang stick" devices, primarily with regard to potential or active litigation.

### Remington Arms Company (CD&R), Ilion Plant

Ilion Research Division                                         December 1993 - November 1994

Senior Staff Engineer - Same position as from August 1982 through November 1993, with changing responsibilities due to reorganization and the relocation of the Ilion Research Division from the Ilion plant site. Resigned effective November 15, 1994.

### Remington Arms Company (DuPont), Ilion Plant

Ilion Research Division                                         August 1982 - November 1993

Senior Staff Engineer (DuPont Research Fellow) - Consultant to the various firearms design groups, regarding general design strategies and product safety issues, evolution of Remington designs, current and new process utilization, and product cost. Represent the company and testify by deposition and at trial, prepare the defense of technical issues in product liability litigation as necessary, for all Remington firearms products. Retired from Remington Arms Company, Inc., effective November 30, 1993.

Production - Industrial Engineering Section                     March 1980 - August 1982

Superintendent of Industrial Engineering - Directed the activities of a staff of 22 professionals, composed of economic analysts, planners and industrial engineers. Responsible for all aspects of industrial engineering at the Ilion Plant, including new and current product cost estimates, project cost estimates, overall plant economic performance, wage-roll job standards and wage rates, cost improvement program, suggestion program, all machine and plant floor-plan layouts, and specialized economic studies.

Production - Manufacturing Section                              July 1979 - March 1980

Supervisor of the Barrel & Receiver Blank Area - As one of six production supervisors at the Ilion Plant, directed 345 wage-roll employees through a staff of seven foremen on a three-shift basis. Responsible for the production of all shotgun, centerfire and rimfire barrel blanks, receiver blanks, numerous machined parts, and injection-molded plastic components, for all firearms manufactured.

**Resume - James C. Hutton**
Page - 3 -

### Production - Manufacturing Section                                June 1978 - July 1979

Supervisor of Trial & Pilot Operations - Acted as planner and coordinator for the initial manufacturing of major new firearms products, and for revisions in manufacturing process for current products. Involved extensive liaison between Process Engineering, Production, R&D and Quality Control sections.

### Production - Process Engineering & Control                       May 1977 - June 1978

Supervisor of Quality Control & Product Testing - Responsibilities in three areas: First, represented the Company in product liability litigation as corporate representative and as expert witness. Second, staff responsibility for the quality control of all manufacturing operations for all firearms models produced at the Ilion Plant. Third, line responsibility for gallery test operations, including the supervision, through foremen, of 35 wage-roll employees on a three-shift basis. Gallery testing involved the safety, proof, functional and accuracy test firing of all production firearms.

### Production - Process Engineering & Control                       September 1976 - May 1977

Senior Process Engineer - As design consultant, advised process engineers and tool designers for the establishment of new processes and revision of current processes, for the manufacturing of the new M/4, M/6, M/7400 and M/7600 series of centerfire rifles.

### Research & Development - Design Section                          January 1970 - September 1976

Progressed from Design Engineer to Senior Research Engineer. Gained a knowledge of all firearms produced by Remington currently and in the past, and of many competitive models also. From June, 1974 to September, 1976 as Senior Research Engineer, directed a team of engineers for the design of the new M/4, M/6, M/7400, and M/7600 series of pump-action and semi-automatic action centerfire rifles, which have been manufactured since 1981. Design representative from R & D for over half of the then currently produced firearms, responsible for the technical defense of these models in product liability litigation.

For the entire period in the design section, designed and directed the design activities of others in all aspects of firearms design development and testing, with primary emphasis on centerfire rifles, but including most other firearms types also. Design activities included design of fire control mechanisms, actuation mechanisms and locking systems, based on studies of locking systems, gun dynamics, gun handling, all manner of firearms testing, and the evaluation and investigative analysis of current and past firearms.

### Research & Development - Test & Measurement Lab                  January 1969 - January 1970

Design Engineer - Assigned to the Laboratory to gain complete knowledge of laboratory and field testing of firearms and ammunition, both Remington and competitive manufacture.

1/1/10